# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **MICHAEL JOHNSON,** | : | **CIVIL CASE NUMBER** |
| *Plaintiff,* | : | |
| | : | **3:14-cv-01619 (VLB)** |
| **v.** | : | |
| | : | **February 23, 2018** |
| **UNITED STATES,** | : | |
| *Defendant.* | : | |

## MEMORANDUM OF DECISION DENYING PETITION FOR RELIEF UNDER 28 U.S.C. § 2255 [DKT. 1]

Petitioner Michael Johnson ("Johnson" or "Petitioner") brings this *pro se* petition for habeas relief under 28 U.S.C. § 2255, asserting eleven ineffective assistance of counsel claims against his counsel who represented him for trial and sentencing. This motion is nearly identical to that filed by the petitioner's co-defendant Jermaine Jones. For the foregoing reasons, this Motion to Vacate, Set Aside, or Correct Sentence, [Dkt. 1], is DENIED.

## Background

On April 1, 2010, a grand jury returned an indictment charging Mr. Johnson and his two co-defendants, Sheikera Williams and Jermaine Jones, with 70 counts of bank fraud in violation of 18 U.S.C. § 1344, one count of conspiracy to commit bank fraud in violation of 18 U.S.C. § 1349, and three counts of aggravated identity theft in violation of 18 U.S.C. § 1028A. *United States v. Williams*, Case No. 10-cr-00080 (VLB) (hereinafter "*Williams*"), [Dkt. 1 (Sealed Indictment)]. At the arraignment on June 29, 2010, Mr. Johnson entered a plea of not guilty and was appointed David J. Wenc ("Attorney Wenc") as CJA counsel. *See Williams* [Dkt. 16 (Arraignment)]. On May 5, 2011, Johnson moved for

appointment of substitute counsel to replace Attorney Wenc, stating he and Attorney Wenc were on "different pages" regarding what motions and evidentiary hearings were appropriate. *Williams* [Dkt. 55.] The Court held a hearing on May 13, 2011, granted the motion for Attorney Wenc to withdraw as counsel, and appointed substitute CJA counsel. *Williams* [Dkt. 58.] On May 17, 2011, Attorney Michael Gerard Dolan ("Attorney Dolan") appeared as CJA counsel. *Williams* [Dkt. 60.]

Co-defendant Williams pleaded guilty on October 3, 2011. *Williams* [Dkt. No. 104 (Change of Plea Hearing)]. A Superseding Indictment was issued on October 11, 2011, which decreased the total counts and instead included seven counts of bank fraud, one count of conspiracy to commit bank fraud, and seven counts of aggravated identity theft, all in violation of the same statutes as previously stated. *Williams* [Dkt. No. 115 (Superseding Indictment)]. After several continuances, the trial was ultimately scheduled for November 2011. *Williams* [Dkts. 157-162.]

The trial began on November 2, 2011 and the jury rendered its verdict on November 17, 2011: guilty on all counts. *Williams* [Dkt. No. 180 (Jury Verdict)]. Mr. Johnson was sentenced on May 30, 2012 and received 240 months' imprisonment on the bank fraud and conspiracy counts to run concurrently; 24 months' imprisonment on the aggravated identity theft counts to run concurrently to each other but consecutively to the 240 months; 60 months' supervised release on the bank fraud and conspiracy counts to run concurrently; 12 months' supervised release on the aggravated identity theft counts to run concurrently; a

special assessment of $1,500.00; and $237.930.00.  *See Williams* [Dkt. No. 244 (Judgment)].

By and through Attorney Dolan, Mr. Johnson appealed his sentence. *Williams* [Dkt. No. 251 (Notice of Appeal)].  The Second Circuit affirmed the sentence in a summary order issued on February 26, 2014.  *Williams* [Dkt. No. 291 (Mandate)].  The Second Circuit upheld his sentence and found that this Court did not err in (1) calculating the loss amount pursuant to § 2B1.1(b)(1), (2) applying a two-level enhancement for "sophisticated means" under § 2B1.1(b)(10), and (3) applying a four-level enhancement for 50 fifty or more victims pursuant to § 2B1.1(b)(2)(B).  *See id.* at 6-7.  Thereafter, Mr. Johnson timely filed this habeas petition before the Court.  18 U.S.C. § 2255(f) (setting a one-year limitations period from the date the judgment of conviction becomes final); [Dkt. 1 (Motion to Vacate filed October 30, 2014).]

## Legal Standard

Section 2255 enables a prisoner in federal custody to petition a federal court to vacate, set aside, or correct the sentence.  28 U.S.C. § 2255(a).  Relief under Section 2255 is generally available "only for a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law or fact that constitutes a fundamental defect which inherently results in complete miscarriage of justice." *Graziano v. United States*, 83 F.3d 587, 590 (2d Cir. 1996) (internal quotation marks and citation omitted).  Section 2255 provides that a district court should grant a hearing "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief."  28 U.S.C. § 2255(b).

Claims for ineffective assistance of counsel are analyzed under the two part test established in *Strickland v. Washington*, 466 U.S. 668 (1984). To prevail, a movant must both allege facts demonstrating that "counsel's representation fell below an objective standard of reasonableness" and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 687–88, 694. As to the first showing, a movant must demonstrate that counsel's performance "amounted to incompetence under 'prevailing professional norms'" rather than demonstrating that the performance "deviated from best practices or most common custom." *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (quoting *Strickland*, 466 U.S. at 690). As to the second showing, a movant must demonstrate "a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

Analysis

Mr. Johnson brings 11 ineffective assistance of counsel claims which dispute instances that occurred during both trial and sentencing. The Court addresses each claim in turn.

I.    Failure to Raise a *Batson* Challenge

Mr. Johnson claims the jury pool included approximately five African Americans and the Government used its peremptory challenges to strike all but one of these individuals. Motion at 8. The use of peremptory challenges, Mr. Johnson contends, was done "in a systematic racial[ly] mot[i]vated manner to [e]nsure that neither one of the African-American prospective jurors were actually seated on the jury." *Id.* As a result, the jury was comprised entirely of white

4

people, and Mr. Johnson argues counsel acted deficiently in failing to object to the jury composition "[i]n light of the [G]overnment's theory of the case, that Movant sought out, and only used, white females to commit the crimes for which he was on trial." *Id.*

The Government disputes the validity of Mr. Johnson's *Batson* challenge for the primary reason that he fails to establish a *prima facie* case of purposeful discrimination. [Dkt. 15 (Opposition) at 11-12]. The Government points out that Mr. Johnson does not cite the transcript or another document identifying the demographics of the venire or the Government's peremptory strikes. *Id.* at 12. Even if he were to satisfy the *prima facie* case, the Government contends he nonetheless fails to establish prejudice. *Id.* at 12.

*Batson v. Kentucky*, 476 U.S. 79 (1986) created a three-step procedure for courts to determine "whether a peremptory strike has been exercised in a racially discriminatory manner." *United States v. Diaz*, 176 F.3d 52, 76 (1999). First, a court must determine whether the petitioner makes out "a *prima facie* showing that the prosecution has exercised its peremptory strike on the basis of race." *Id.* If defendant satisfies the first step, the court must then evaluate "whether the government has satisfied its burden of coming forward with a race-neutral explanation for striking the juror in question." *Id.* If so, the court evaluates "whether the defendant has carried his burden of persuasion of proving purposeful discrimination." *Id.*

There are several ways in which a petitioner can make a *prima facie* showing of racial discrimination. A court should consider "how many members

of the cognizable racial group are in the venire panel from which the petit jury is chosen, the pattern of strikes against racial group jurors in the particular venire, the prosecutor's statements and questions during selection, as well as any other relevant circumstances." *Tankleff v. Senkowski*, 135 F.3d 235, 249 (2d Cir. 1998) (addressing *prima facie* showing in the *Powers* context). "When the asserted prima facie case is based upon the use of strikes to exclude all or nearly all of the members of a particular racial group, the record need only include how many members of that group were in the venire, and how many of those were struck." *Jones v. West*, 555 F.3d 90, 99 (2d Cir. 2009).

Mr. Johnson has not provided the Court with any evidence supporting his claim. Nonetheless, the Court independently assessed the venire documents kept by the Clerk. The jury pool contained only two individuals who identified as African American. The first person was randomly assigned pool number 39, and the Court, not the Government, struck him for cause. The second person was randomly assigned pool number 64, and she was chosen as the third alternate. It is worth noting the twelfth juror was assigned pool number 49, and therefore the random nature of the jury selection process essentially made it impossible for the alternate to have been picked as a juror given she was questioned 15 people later. The Court also notes the Government used peremptory challenges on eight people, seven who were listed as White and one who was listed as Other. One chosen juror was also listed as Other. The objective evidence does not support a finding that the Government's actions were racially motivated or that Attorney Dolan acted below an objective standard of reasonableness in failing to object to

petit jurors having been stricken.  Neither Mr. Johnson nor the record offer any factual support for this claim and therefore a hearing is not warranted.  *See Strickland*, 466 U.S. at 687-88.

## II.    Failure to Object to Discovery

Mr. Johnson claims the Government withheld exculpatory evidence as demonstrated by the changes in the Superseding Indictment, which reduced the number of Defendants from three to two and the number of bank fraud counts from 74 to seven.  Motion at 12-13.  Specifically, Mr. Johnson believes the Government withheld all discovery pertaining to Counts 9, 11, 13 and 15 of the Superseding Indictment.  *Id.* at 13.  The Government maintains that it "provided early and fulsome discovery in this case, beginning in July 2010," and that Mr. Johnson's characterization demonstrates a misunderstanding of the discovery process rather than any potential misconduct.  Opposition at 13-14.

In *Brady v. Maryland*, 373 U.S. 83 (1963), the United States Supreme Court established the requirement to disclose all evidence that could be considered exculpatory or bearing on a defendant's innocence or guilt.  The Government's obligations under *Brady* are well-established. The prosecution has a constitutional duty to disclose evidence favorable to an accused when such evidence is material to guilt or punishment. *Id.* at 87. This duty covers not only exculpatory evidence, but also information that could be used to impeach a key government witness.  *See Giglio v. United States*, 405 U.S. 150, 154 (1972).  *Brady* does not, however, require the prosecution to disclose *all* exculpatory and impeachment evidence; it need disclose only that, which "if suppressed, would

deprive the defendant of a fair trial." *United States v. Bagley*, 473 U.S. 667, 675 (1985). In the context of *Brady*, a defendant is deprived of a fair trial only where there is a reasonable probability that the government's suppression affected the outcome of the case, *see id.* at 682, or where the suppressed evidence "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict," *Kyles v. Whitley*, 514 U.S. 419, 435 (1995).

Mr. Johnson has failed to identify any evidence withheld by the Government, much less any evidence that would have changed the outcome of the trial and the withholding of which thus deprived him of a fair trial. It appears as if the evidence Mr. Johnson challenges was not even "favorable to the accused" as his position is the Government "failed to disclose any discovery whatsoever to support its inclusion of Counts 9, 11, 13, and 15 of the Superseding Indictment." Motion at 13. The Government avers that it timely disclosed all discovery beginning in June 2010, which relate to the Superseding Indictment filed October 2011. Opposition at 13. The filing of a Superseding Indictment, which reduced the total number of counts and adjusted the nature of the counts, does not inherently mean discovery was withheld. Mr. Johnson has not met his burden to establish deficient performance because he has not alleged any facts demonstrating how the absence of an objection on these grounds means counsel's performance fell below an objective standard of reasonableness. *See Strickland*, 466 U.S. at 687–88; *Lewis v. Feliciano*, No. 3:09cv20171 (DJS), 2012 WL 1247264, at *9 (D. Conn. Apr. 13, 2014) (stating that "[a]bsent any indication as to what the witnesses would have stated or what the

evidence would have shown, Lewis failed to meet [his] burden" of demonstrating deficient performance on *Brady* grounds). Therefore, the Court need not address the prejudice prong.

### III. Failure to File Motion to Sever

Mr. Johnson criticizes defense counsel's failure to sever his case from that of his co-defendant, Michael Jones. Attorney Dolan filed a motion to sever on September 1, 2011, which asserted that co-defendant Williams intended to argue that Johnson coerced Williams to participate in the criminal conduct. *Williams* [Dkt. 98.] Attorney Dolan argued Williams' defense would prejudice Johnson and accordingly Johnson's trial must be severed from Williams'. *Id.* Because Williams ultimately pleaded guilty, the Court found the motion to sever moot. *Williams* [Dkt. 113.] Johnson asserts "it was unreasonable for counsel to have proceeded to cause the court to moot the motion for severance" because it was "based on facts whereby relief could have been granted." Motion at 14. The Government notes Attorney Dolan's motion to sever from Williams and the Court's subsequent mooting of that issue, and also asserts that there was no basis to sever Johnson's case from ==co-defendant== Jones'. Opposition at 15. The Government notes that the critical question for severance is whether a joint trial prejudiced the movant and Mr. Johnson failed to identify any basis for a finding of prejudice. Opposition at 16.

Rule 14 of the Federal Rules of Criminal Procedure provides that "[i]f the joinder of offenses or defendants in an indictment . . . appears to prejudice a defendant or the government, the court may order separate trials of counts, sever

the defendants' trials, or provide any other relief that justice requires."  Fed. R.

Crim. P. 14(a).  There is a clear preference for a joint trial where "the defendants

are alleged to have participated in a common plan or scheme."  *United States v.*

*Fazio*, 770 F.3d 160, 166 (2d Cir. 2014) (citing *United States v. Salameh*, 152 F. 3d

88, 115 (2d Cir. 1998)).  A court is to sever defendants "only if there is a serious

risk that a joint trial would compromise a specific trial right of one of the

defendants, or prevent the jury from making a reliable judgment about guilt or

innocence."  *United States v. Astra Motor Cars*, 352 F. Supp. 2d 367, 369-70

(E.D.N.Y. 2005) (quoting *Zafiro v. United States*, 506 U.S. 534, 539 (1993)).  Such a

determination is left to the sound discretion of the court.  *Zafiro v. United States*,

506 U.S. at 539.

Mr. Johnson has not presented the Court with any evidence that he was

denied a fair trial.  After reviewing the trial transcripts, the Court finds that

Defendants participated in a "common scheme or plan," *Fazio*, 770 F.3d at 166.

Paragraph 12 of the Presentence Report was replete with summaries of the

testimony introduced at trial establishing their conspiratorial conduct. Counsel

did not act unreasonably when he did not move for reconsideration of the Court's

finding that the motion to sever was mooted by Williams' change of plea, nor did

counsel act unreasonably by failing to move to sever from co-defendant Jones.

Attorney Dolan did not act unreasonably in light of the facts of the case, his

understanding of prevailing case law, and the unlikelihood that a motion to

reconsider the motion to sever from Williams, or a motion to sever from Jones,

would have been granted.  *See id.*

**IV.** **Failure to Sequester Special Agent Mahar**

Mr. Johnson believes defense counsel was ineffective in failing to demand Special Agent Ryan Mahar be sequestered from the trial. Motion at 15. He argues Agent Mahar participated in the investigation and "[p]rejudice resulted when the agent controlled the flow of evidence for the prosecution, in such a manner so as to actually prosecute the case, thus denying Movant of a fair trial." *Id.* The Government does not dispute Agent Mahar's presence during trial but contends that such presence is permitted by the Federal Rules of Evidence and case law. Opposition at 17.

Rule 615 of the Federal Rules of Evidence requires a court to sequester a witness upon a party's request or on its own "so that they cannot hear other witnesses' testimony." One exception to this rule applies where "an officer or employee of a party that is not a natural person [is] designated as the party's representative by its attorney." Fed. R. Evid. 615(b). In keeping with this rule, a "district court has discretion to exempt the government's chief investigative agent from sequestration, and it is well settled that such an exemption is proper under Rule 615[b], deeming the agent–witness a 'representative' of the government." *United States v. Lee*, 834 F.3d 145, 162 (2d Cir. 2016) (internal quotation marks and citations omitted); *see Griffith v. United States*, No. 03 Civ. 7860(HB), 03 Civ. 7861(HB), 2005 WL 245071, at *6 (S.D.N.Y. Oct. 6, 2005) ("In light of such well-settled precedent [establishing the court's discretion] it is reasonable for the Griffiths' counsel not to have objected to the agent's presence in the courtroom."). Therefore, defense counsel was not deficient for failing to

request sequestration because Agent Mahar would have fit within the ambit of the Rule 615(b) exception.  *See United States v. Lott*, 365 F. App'x 946, 950 (10th Cir. 2010) (ruling defense counsel's failure to seek sequestration of government's case agent did not constitute ineffective assistance of counsel because the witness would have fallen within a Rule 615 exception).  Mr. Johnson fails to provide a legal or factual basis that warrants a finding of deficiency or prejudice.

V.  <u>Failure to Object to Special Agent's Expert Testimony and the Lack of Foundation</u>

Mr. Johnson bases this next ineffective assistance of counsel claim on defense counsel's failure to object to the foundation laid for Agent Mahar to testify as an expert and his subsequent testimony.  Motion at 17.  Agent Mahar's classification as an expert and associated testimony purportedly "served no purpose but to bolster the credibility of the witnesses whose credibility is/was questionable at best."  *Id.* at 18.  The Government argues that it laid a proper foundation for Agent Mahar's testimony as an expert and that his testimony in multiple capacities was permissible.  Opposition at 18.

With respect to the foundation issue, the Government established that Agent Mahar holds a Bachelor's degree from the University of Nashville, Tennessee and that he became a forensic examiner for the United States Secret Service in 2006.  [Dkt. 267 (Tr. 11/14/11) at 225:17-226:2].  He received approximately 140 hours of special training in cell phone forensics, which has taught him how to recover digital evidence from various devices.  *Id.* at 226:3-11. In total, he has analyzed over 50 cell phones.  *Id.* at 226:12-14.   He had previously been qualified as an expert in cell phone forensics in Connecticut state court.  *Id.*

12

at 226:21-25. After discussing the nature of the expert testimony at side bar, neither defense counsel for Mr. Johnson nor defense counsel for Mr. Jones objected to his determination as expert. *See id.* at 227:3-20. Mr. Johnson has not brought forth any factual evidence or a legal basis indicating the Agent Mahar is not "qualified as an expert by knowledge, skill, experience, training or education. . . ." Fed. R. Evid. 702. The Court finds the Government sufficiently laid a foundation for Agent Mahar to testify as an expert and that Attorney Dolan's performance did not fall below prevailing professional norms in abstaining from objection. *See Harrington*, 562 U.S. at 105.

Mr. Johnson's contention that his qualification as an expert bolstered his lay witness testimony requires a closer analysis, but ultimately it does not prevail. In certain circumstances, a case agent's testimony as an expert carries some risks of juror confusion, *see* Fed. R. Evid. 403, because "[s]ome jurors will find it difficult to discern whether the witness is relying properly on his general experience and reliable methodology, or improperly on what he has learned of the case." *United States v. Dukagjini*, 326 F.3d 45, 54 (2d Cir. 2003). Accordingly, there exists a risk that a case agent testifying about both an expert opinion and the facts of the case "may easily elide these two aspects of their testimony." *Id.* at 55-56. Indeed, "[g]iven their role, their perspective, and their focus on the facts, these case agent experts are more likely to stray from the scope of their expertise and to testify about other aspects of the case, including the divulging of hearsay evidence." *Id.* at 55-56.

Here, the potential for juror confusion was minimal because the Government questioned Agent Mahar on a very narrow set of issues; he testified almost exclusively to the summarization of certified records and the content of documents that were submitted into evidence.  *See generally* [Dkt. 267 at 206:15-242:11; Dkt. 268 at 6:11-24:24].  Agent Mahar did not provide hearsay evidence or stray from the scope of his expertise.  *Id.*  Mr. Johnson fails to demonstrate how counsel's failure to object would be deficient, let alone prejudicial, to his case.

VI.  <u>Failure to Object to Evidence at Trial</u>

Mr. Johnson lists in four groups several exhibits that were introduced without objection and contends that the failure to object constituted ineffective assistance of counsel.  Motion at 18.  He does not identify the objections that could have been made or establish why the failure to object would have been deficient.

First, Mr. Johnson argues Attorney Dolan was ineffective for allowing the Government's Exhibit 301 to be admitted and to subsequently be amended.  *See* [Dkt. 1-1 at 18].  This exhibit is a summary chart of Exhibits 1-100 and was admissible pursuant to Fed. R. Evid. 1006, which enables a proponent to "use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court." Because the Court admitted the documents pursuant to Fed. R. Evid. 1006, *see* [Dkt. 260 (Tr. 11/2/11) at 3:7-23], and the underlying documents were admitted as exhibits as well, Mr. Johnson has not shown how, if at all, the summary charts failed to reflect accurately the underlying exhibits.  Consequently, he has failed to

show how Attorney Dolan acted below his objective standard of reasonableness in failing to object to the introduction of unobjectionable exhibits which merely summarized voluminous admissible exhibits. *See Strickland*, 466 U.S. at 687-88. There is no basis for the Court to conclude that Attorney Dolan performed deficiently by allowing the summary chart to be amended as trial continued. The revisions certainly did not amount to anything serious enough to undermine the outcome of trial. *See Strickland*, 466 U.S. at 964.

Second, Mr. Johnson contends that Exhibits 23-A-1, 23-B-1, 24-A-1, 24-B-1, 25-A-1, 25-B-1, 26-B-1, 27-A-1, and 27-B-1 should not have been introduced as they were notes referred to by witness Marie Martin. *See* [Dkt. 1-1 at 18]. At the beginning of the direct examination, the Government handed Ms. Martin a binder of Exhibits 23 through 28, *see* [Dkt. 261 (Tr. 11/3/11) at 38:2-10], and the record reflects these exhibits were copies of checks, not notes, *see id.* at 38:2-40:19]. In addition, Ms. Martin brought copies of returned checks "along with the reason . . . that it was returned . . . from a second bank." *See* [Dkt. 261 at 46:4-13]. Ms. Martin testified that the check "is the same as . . . the original check when it was negotiated" but "[i]t's before we knew it was going to return." *Id.* She also testified, "When it's returned it looks the same but they just put a return reason." *Id.* These documents were admitted under the business records exception as the Government established they were version of other exhibits created by the employee with knowledge near the time of the transaction, they were kept in the ordinary course of business, and they were made as a regular practice of that activity. *See* Fed. R. Evid. 803(6)(A)-(C); *see* [Dkt. 261 at 38:3-65:1; 47:15-48-14].

The fact that there is a stated reason for the return does not mean the documents were not admissible. The record indicates defense counsel possessed these documents prior to the trial, and defense counsel's copies were submitted into evidence. *Id.* at 49:18-50:7. Attorney Dolan did not act deficiently because these documents were admissible.[1]

Third, Mr. Johnson challenges Attorney Dolan's stipulation to Exhibits 140A-C and 154A-C. *See* [Dkt. 1-1 at 19]. Witness Susan McGregor testified that Exhibits 140A-C were her driver's license, debit card, and a check made out in her name. *See* [Dkt. 264 (Tr. 11/8/11) at 54:3-24]. Witness Mary Willingham testified that Exhibits 154A-C were her driver's license, credit card, and military identification. *See id.* at 48:21-49:9]. The parties stipulated to the admissibility of Exhibits 140A-C and 154A-C, which were "similar to exhibits previously stipulated for admission as full exhibits." *Id.* at 56:12-23. Regardless, these documents were relevant, authenticated by their owners in a manner sufficient to support a finding that each was what its proponent claimed it was and were thus admissible. *See* Fed. R. Evid. §§ 401, 402 and 901(a).

Further, Federal Rule of Civil Procedure 11 precludes an attorney from making specious objections. Specifically, that rule states:

> By presenting to the court a pleading, written motion, or other paper—whether by signing, filing, submitting, or later advocating it—an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:

---

[1] Mr. Johnson also fails to direct the Court to the Avis Budget sheet substitutions to which he objects. The Court will not address his reference to this claim, without more.

> **(1)** it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;
>
> **(2)** the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;

Fed R. Civ. Pl 11(b)(1)-(2).  Jones fails to offer any factual or legal basis to challenge the admissibility of these documents.  Having no basis to challenge the documents, Attorney Dolan acted as a reasonable attorney in stipulating to the admission.

Fourth, Mr. Johnson claims that Exhibits 14, 23, 52, and 96 should not have been admitted because they supported Counts 9, 11, 13, and 15 and had never been disclosed to him prior to trial. *See* [Dkt. 1-1 at 19].  These exhibits were checks submitted into evidence, which were also featured in the summary chart.  Attorney Dolan did not perform below an objective standard of reasonableness for the same reasons as the above exhibits pertaining to Ms. Martin's testimony.  *See* Dkt. 260 at 61:9-62:14 (admitting Exhibit 96 as a business record); Dkt. 261 at 38:3-40:14, 67:1-69:20, 127:24-129:19 (admitting Exhibits 14, 23, and 52 as a business record)].  Assuming Mr. Johnson did not have the opportunity to review these documents prior to trial, these checks were just four of the 100 checks submitted into evidence and would not have "undermine[d] confidence in the outcome."  *See Strickland*, 466 U.S. at 694.  Accordingly, this ineffective assistance of counsel claim fails.

**VII.**     <u>Failure to Advise of Right to Testify</u>

It is Mr. Johnson's position that Attorney Dolan failed to advise him of his right to testify.  Motion at 19-21.  Specifically, Mr. Johnson claims that "counsel knew [he] wanted to testify and tell his side of the story regarding the offense" and that "counsel knew that Movant only proceeded to a jury trial whereas he could testify regarding loss amounts attributed to him. . . ."  *Id.* at 20.  The Government objects to Mr. Johnson's claim on two key bases: (1) Attorney Dolan's affidavit, which conflicts with Mr. Johnson's affidavit, demonstrates that Attorney Dolan advised Mr. Johnson about his right to choose to testify; and (2) Mr. Johnson cannot show prejudice because he only wanted to testify to the loss amount and the Government would have questioned him on his lengthy criminal record, which undoubtedly would have seriously undermined his credibility and thus been damaging to his case.  Opposition at 23-24; [Dkt. 15-1 (Dolan Affidavit) at ¶ 8].

It is well-settled that a criminal defendant "has the right to take the witness stand and to testify in his or her own defense."  *Bennett v. United States*, 663 F.3d 71, 84 (2d Cir. 2011) (quoting *Rock v. Arkansas*, 483 U.S. 44, 49 (1987)).  The decision to testify is solely for the defendant to make, and defense counsel is tasked with the responsibility to "advis[e] the defendant of his right to testify or not to testify."  *Id.*  Included in counsel's duty is to "advise the defendant about the benefits and hazards of testifying and not testifying," and although counsel is permitted to "strongly advise the course that counsel thinks best" he must leave the ultimate decision to the defendant.  *Id.*

Attorney Dolan submitted an affidavit indicating he believes Mr. Johnson should not testify due in part because of his extensive criminal history. Dolan Affidavit at ¶ 8. Attorney Dolan averred that Mr. Johnson ultimately decided "not to testify." *Id.* at ¶ 9. This affidavit directly conflicts with Mr. Johnson's declaration wherein he claims Attorney Dolan prevented him from testifying even though Attorney Dolan knew he wanted to testify. [Dkt. 9 (Johnson Affidavit) at ¶ 21].

With respect to *Strickland*'s deficiency prong, the Second Circuit has upheld a district court's denial of a hearing when the only evidence supporting counsel's failure to provide the right to testify was the Mr. Johnson's "own blanket statements" that he was prevented from testifying. *See Chang v. United States*, 250 F.3d 79, 84-85 (2d Cir. 2001). In *Chang*, however, the trial counsel supplemented the record with a "detailed affidavit . . . credibly describing the circumstances concerning appellant's failure to testify." *See id.* at 85. Here, Attorney Dolan's affidavit falls short of being sufficiently detailed on this issue. As a general matter, where a claim involves "off-the-record interactions" with trial counsel, it "cannot be determined by examining the motion, files, and records before the district court." *Id.* at 85. The Court thus assumes without deciding only for the purposes of this analysis that his performance was deficient.

The Court nonetheless determines a hearing is not warranted because Mr. Johnson fails to properly address the prejudice prong under *Strickland*. As Mr. Johnson himself avers in his brief, counsel knew he proceeded to trial so "he could testify regarding loss amounts attributed to him, as he never denied any

involvement in the offense." Motion at 20-21. Mr. Johnson does not provide the Court with any other content to which he would have testified, and accordingly the Court cannot conclude there is a reasonable probability the verdict would have been different. *See generally Brown v. Artuz*, 124 F.3d 73, 81 (2d Cir. 1997) (assessing petitioner's proposed testimony and ruling that he would not have been able to satisfy all elements of a justification defense, thereby failing to establish prejudice); *Perez v. United States*, No. 3:09cv30 (JBA), 2012 WL 1067549, at *5 (D. Conn. Mar. 30, 2012) ("Without offering any explanation as to what he would have testified about, or how that could have possibly changed the outcome of his trial, Petitioner cannot demonstrate that but for Attorney Reeve's alleged advice about his testifying, there is a reasonable probability that the outcome of the trial would have been different."). Therefore, the Court will not order a hearing or find Attorney Dolan's representation was constitutionally ineffective on this ground.

## VIII. Failure to Seek Two-Level Departure for Acceptance of Responsibility

Johnson asserts Attorney Dolan was deficient because he did not seek a two-level downward adjustment for acceptance of responsibility in the sentencing memorandum. *Williams* [Dkt. 233.] However, Mr. Johnson has not established in what way counsel's performance is deficient for recognizing the fact that Mr. Johnson did not qualify for the acceptance of responsibility adjustment. Comment Two to the applicable Sentencing Guideline states the acceptance of responsibility adjustment "is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual

20

elements of guilt, is convicted, and only then admits guilt and expresses remorse." U.S.S.G. § 3E1.1, cmt. 2 (2011). The Commission identified only *rare circumstances* for awarding an acceptance of responsibility adjustment despite a defendant's exercise of his right to a jury trial, included which are attempts to "assert and preserve issues that do not relate to factual guilt (e.g., to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct)." *Id.* Such a determination is to be based on "pretrial statements and conduct." *Id.* Mr. Johnson may have admitted his culpable conduct to his counsel, but the fact remains that he proceeded to trial leaving the Government to its burden of proof. He did not exercise his right to trial solely to preserve issues unrelated to factual guilt and therefore he cannot establish counsel's performance was deficient.

In addition, at sentencing most attorneys seek to cast their clients in a favorable light; as contrite and remorseful rather than argumentative and disrespectful of the law. Recognizing a clear and unambiguous provision of the sentencing guidelines rather than making a specious argument for an adjustment for which a client is clearly not entitled is a strategy to cast a client in the most favorable light possible in order to best assure a more lenient sentence. A reasonable strategic decision cannot form the basis or an ineffective assistance claim. *United States v. Nersesian*, 824 F.2d 1294, 1321 (2d Cir. 1987); *United States v. Eisen*, 974 F.2d 246, 265 (2d Cir. 1992) (applying the trial strategy principle to a § 2255 motion). Strategic trial decisions, "if reasonably made, will

not constitute a basis for an ineffective assistance claim." *Nersesian*, 824 F.2d at 1321.

Moreover, the sentencing transcript makes clear that Mr. Dolan did not forego making an available argument that Mr. Johnson took responsibility for his personal conduct as he understood it. *Williams* [Dkt. 280.] Rather, Johnson made clear in his statement at sentencing that he had not accepted responsibility. *Id*. Mr. Johnson stated: "What I did was wrong, but at that particular time, you know, I thought that, you know, I really wasn't doing anything wrong, but I accept my responsibility, you know, for what I did." *Id*. at 36. The Court replied, "How can you say you didn't think you were doing anything wrong when you were breaking people's property?" *Id*. at 37. Mr. Johnson began to answer, Attorney Dolan requested a moment to speak with Mr. Johnson, and after they conferred Mr. Johnson again began to speak. *Id*. "Well, Your Honor, my attorney just advice, but I'm gonna tell you anyway. Your Honor, I never broken into nobody's car. Now, my role involved in this, yes, I rented cars for Sheikera, and I didn't think, you know, by me renting a car, that I was actually involved in a situation, but I realized though, I am. I'm just as irresponsible as them, . . . I apologize and I'm remorseful for what I did, and for what they did, too, because we all in the same boat under this conspiracy. What, you know, all the facts, Your Honor, there – those are not the facts so, you know, I just think as a man and take what I did, and whatever they did too because,  you know, I guess that's the noble thing to do." *Id*. at 37-38. The Court replied, "You never broke into a car?" *Id*. at 38. Johnson answered, "Never." *Id*. at 38. The Court responded, "What was your

wallet doing beside the car here in Bloomfield, Connecticut?" *Id.* Johnson responded, "See, that situation, it was Deneen, this is . . . Deneen and Sheikera out and about doing the thing. I wasn't even with them. . . . I can't sit here and lie, Your Honor, and say I didn't know what they was doing, but I actually didn't know what they was doing. . . . but I do admit my part. I rented cars. . . . " *Id.* at 38, 40. The Court responded, "So the cashers who sat here on that witness stand, swore an oath . . . and testified that you recruited them were lying?" *Id.* at 40-41. Johnson responded, "Yes, Your Honor." *Id.* at 41.

The Court did not adjust Johnson's sentence downward for acceptance of responsibility, but rather noted that under the Section 3553 factors, the "Court must promote respect for the law, and Mr. Johnson's statement here today, that he didn't know he was doing anything wrong, speaks volumes to the need for this sentence to engender in him, a respect for the law. How anyone could think that breaking into other people's property, damaging their property, stealing their property, stealing from banks, getting arrested, watching your co-conspirators get arrested is not indicative of your doing something wrong is just beyond my comprehension." *Id.* at 56-57. Mr. Johnson's statement at sentencing and the Court's Section 3553 findings on the record make clear that Attorney Dolan was not deficient for failing to argue for a downward adjustment for acceptance of responsibility. Mr. Johnson cannot show that Mr. Dolan's failure to argue against the obvious altered the outcome of his case.

IX.    **Failure to Challenge the Judgment**

Mr. Johnson claims that during sentencing, the Court imposed a term of supervised release of five years and no restitution. Motion at 28. However, Mr. Johnson asserts the written judgment provides for a term of supervised release of six years as well as restitution. *Id.* Mr. Johnson asserts Attorney Dolan erred in failing to investigate or appeal this discrepancy. *Id.*

At sentencing, the Court imposed a "total effective period of supervised release of five years, that's five years for each of Counts One through Eight, and one year for Counts Nine through Fifteen, concurrent to each other and to One through Eight." *Williams* [Dkt. 280 at 65.] The judgment accordingly states "Upon release from imprisonment, the defendant shall be on supervised release on Counts One through Seven for 60 months concurrently; on Count Eight for 60 months concurrent to the supervised release imposed for Counts One through Seven; and on Counts Nine through Fifteen for 12 months concurrent to each other." *Williams* [Dkt. 244 at 1.] There is no discrepancy between the Court's statement at sentencing and the written judgment: both impose a period of supervised release of five years.

The Court also ordered restitution in the amount of the total actual loss caused by the criminal conduct, $273,930. *Williams* [Dkt. 280 at 67-68.] That same amount of restitution is reflected in the written judgment. *Williams* [Dkt. 244 at 2.] Johnson was in the courtroom when the Court imposed his sentence, including the period of supervised release and restitution, as evidenced by his statements on the record both before and after the sentence was imposed. *Williams* [Dkt. 280 at 65 (showing that the Court asked Mr. Johnson to stand to

24

receive his sentence), 69 (showing the following interaction after the Court imposed the sentence: "The Court: Now, Mr. Johnson? The Defendant: Yes, ma'am?" whereupon the Court advised Johnson of his right to appeal).]  There is no reason to believe, in light of the Court's direction, that Johnson was not present to receive either challenged aspect of his sentence.  There is no discrepancy between the sentence imposed orally by the Court and that written in the judgment.  Attorney Dolan did not act below the objective standard of reasonableness in failing to challenge the judgment as inconsistent with the oral sentence.

X.     Failure to Seek a Lower Sentence

Mr. Johnson claims Attorney Dolan should have sought the same term of imprisonment which was imposed on his co-defendant, Mr. Jones.  Motion at 30. Mr. Jones received a sentence of 240 months' imprisonment, 24 months lower than Mr. Johnson's sentence.  *Williams* [Dkt. 245 (Jones Judgment).]  Mr. Johnson asserts Attorney Dolan should have argued for the same sentence Mr. Jones received because they were both prosecuted together.  Motion at 30.  Mr. Johnson presents no legal authority to support this claim.  *Id.*

While a sentencing court must consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," the court is not required to "consider disparities between co-defendants."  *United States v. Frias*, 521 F.3d 229, 236 (2d Cir. 2008) (citing 18 U.S.C. § 3553(a)(6); *Kimbrough v. United States*, 128 S. Ct. 558, 574 (2007)).  Where co-defendants are differently situated, different sentences are

reasonable.  *Id.*; *United States v. Chervin*, 553 F. App'x 63, 64 (2d Cir. 2014)

(finding different sentences for co-defendants appropriate where the defendant

challenging his sentence failed to show that he was similarly situated with his co-

defendants).  Where a court explains that it is sentencing one defendant to a

longer term of imprisonment than his co-defendants due to, for example, that

defendant's prominent role in the criminal scheme, the sentencing disparity is

reasonable under Section 3553(a).  *United States v. Guglielmo*, 307 F. App'x 575,

577 (2d Cir. 2009) (upholding a sentence where the "district court fully explained

the reasons why it imposed the sentence in this case, including that, unlike his

co-defendants, Guglielmo had been convicted of another offense . . . [and] in light

of Guglielmo's prominent role in the fraudulent scheme").

      Here, the Court clearly explained the basis for Mr. Johnson's increased

sentence.  *Williams* [Dkt. 280 at 55.]  The court noted its consideration the

evidence introduced at trial and summarized in paragraph twelve of the

Presentence Report which established the centrality of Mr. Johnson' role in the

conspiracy to commit bank fraud.  The evidence established that he not only

recruited and managed most of the check cashers who testified, but he also,

along with Mr. Jones, broke into cars and stole the tools of the bank fraud

scheme, without which it could not have occurred. PSR ¶12.   The testimony also

established that while Williams was in jail, Johnson continued the scheme in her

absence.  See, *Id.*  One such occasion was in May of 2008 when Mr. Johnson was

charged along with two passengers with Fraudulent Use or Possession of

Identifying Information after law enforcement officers stopped his vehicle and

located multiple state identification cards, driver licenses, credit cards, debit cards, and personal checks belonging to females who were victims of burglaries in Texas, Florida, and Georgia.  There was no evidence that Jones ever led the conspiracy alone.

At sentencing, the Court explicitly considered "the relative involvement" of the participants in the conspiracy, and found that "Mr. Johnson's role in this conspiracy was greater than that of Mr. Jones."  *Id.* at 58.  The Court found Johnson had a leadership role in the scheme as he "recruited and supervised cashers, . . . forced Deneed Johnson out of a car and out of a hotel room, as evidence of his leadership role."  *Id.*  In addition, the Court explained that Mr. Johnson was "the originator.  I certainly agree that it is altogether likely that Sheikera Williams took your scheme to another level, but together, together you conceived this scheme.  Together you led this scheme.  Together you managed this scheme, and you individually drove on forays to engage in this scheme without Sheikera Williams."  *Id.* at 58.

Attorney Dolan did argue for a lesser sentence, based on an alternative calculation of the loss amount, an argument that the crimes did not involve a sophisticated means, and an argument that Johnson was not a leader in the conspiracy.  *Williams* [Dkt. 233 (Sentencing Memo) at 3-4.]  The Court considered and ultimately rejected these arguments at sentencing.  The law and the evidence in this case would not have supported an argument that Mr. Johnson should receive an identical sentence to Mr. Jones for the reason the Court articulated at sentencing: the co-defendants were not similarly situated as Mr. Johnson had

greater involvement in managing the criminal scheme. Mr. Johnson has not shown why Attorney Dolan was deficient for failing to raise a meritless argument. Nor can Mr. Johnson assert any prejudice from the failure to raise that argument, as the Court explicitly determined that identical sentences were inappropriate in this case and explained its reasoning on the record at sentencing . *Williams* [Dkt. 280 at 57-58.]

 XI.    <u>Failure to Impeach at Trial</u>

Mr. Johnson claims defense counsel was ineffective in failing to impeach witnesses ~~Deneen Johnson, Mallory Markovic~~, ~~Ashley Dunn~~, Rebecca Souve, ~~Megan Fox~~, and Shekeira Williams through their prior inconsistent statements. Motion at 31.

"Decisions whether to engage in cross-examination, and if so to what extent and in what manner, are . . . strategic in nature." *Nersesian*, 824 F.2d at 1321; *Eisen*, 974 F.2d at 265. Strategic trial decisions, "if reasonably made, will not constitute a basis for an ineffective assistance claim." *Id.*

Where appropriate, Attorney Dolan used prior inconsistent statements for impeachment purposes. For example, Mallory Markovic stated on direct examination that Johnson was one of the people she saw most when participating in the scheme. [Dkt. 263 at 200.] On cross-examination, Attorney Dolan's questions revealed that Johnson was not present for at least two scheme-related trips. [*Id.* at 216.] Later during the trial, Megan Fox stated on direct examination that when she went to New Jersey to cash checks in furtherance of the scheme, she was with Jermaine Jones, a female and a male

who were dating but whose names she did not recall.  [Dkt. 265 at 97-98.]  On

cross-examination, Attorney Dolan elicited testimony that Ms. Fox testified at the

grand jury proceeding that only Jones and a female were present in New Jersey.

[*Id.* at 134.]  In another instance, Attorney Dolan impeached Ms. Johnson

regarding her inconsistent statements:

> Q: Regarding the Texas case you testified here about the center line punches that were found in the vehicle.  You testified that you pretended you didn't know what they were, right?
> A: Right.
> Q: Okay.  And you did that out of self interest, right?
> A: Correct.
> Q: You played dumb out of self-interest.
> A: Right. (at 12) . . .
> Q: Now, when you were pulled over in Texas the police found these center line punches in the vehicle, right?
> A: They found them in my purse after they caught Peezi.  He put the center line punches in my purse.
> Q: Right.  And your purse was in the vehicle.
> A: Yeah . . .
> Q: Okay.  And you knew what they were used for, right?
> A: Correct.
> Q: And you knew who they belonged to, right?
> A: Yes.
> Q: And they belonged to Jermaine Jones? . . . And Peezi?
> A: They were given to me by Sheikera. . . .
> Q: Okay.  You testified earlier last week that they belonged to Jermaine Jones and Peezi.  Is that correct? . . . Or do you want to change your testimony?
> A: No.  They belonged to each and every one of them.

[Dkt. 263 at 12-14.]  Attorney Dolan also challenged Ashley Dunn's

credibility through her prior inconsistent statements:

> Q: You fooled bank tellers into giving you, at times, thousands of dollars, right?
> A: Yes.
> Q: Now, when you were arrested in Kansas, you were wearing a wig, right?
> A: Yes, sir.
> Q: Okay.  And you wore that wig as a disguise, right? . . . You wore tha twig to try to fool the bank teller, right?

A: Yes, sir. . . .

Q: But that's not what you told the police was the reason you wore that wig; is it?

A: No, it wasn't.

Q: Okay. You actually lied to the police, right?

A: Yes, I did, but I told them the truth after they found out.

Q: But you lied to the police initially, right?

A: Yeah. . . .

Q: You told the police you were wearing the wig because you had cancer, right?

A: Yeah . . .

[Dkt. 264 at 93-94.]

Likewise, Attorney Dolan impeached Rebecca Souve with her grand

jury testimony:

Q: And now you testified that you met up with [Sheikera Williams] again to engage in some more bank fraud?

A: Correct.

Q: All right. And you also testified that Michael Johnson was with her, right?

A: Correct.

Q: Are you sure of that?

A: Yes. . . .

Q: All right. Do you remember testifying before a grand jury in this courthouse in November of 2009?

A: I do. . . .

Q: And you were given an oath? You raised your right hand, and you swore to tell the truth at that time, right?

A: Yes. . . .

Q: Didn't you tell the grand jury then that you met Sheikera, Jermaine Jones and a white guy, and those were the only people present when they gave you the checks?

A: I don't remember. . . .

Q: Isn't it true that Michael Johnson wasn't with Sheikera Williams, Jermaine Jones and some white guy back when you met up with them in Florida?

A: I can't say whether it's true or not. I honestly don't remember.

[Dkt. 265 at 53-55.]

Finally, Attorney Dolan also exposed Sheikera Williams' inconsistent statements:

Q: Do you know a woman named Sabrina Lightfoot?

A: Yes.

Q: Okay. And she was involved in a bank fraud scam, right?

A: Yes. . . .

**Q: Isn't she the one who actually taught you the check cashing scam?**
**A: No.**
**Q: Are you sure of that?**
**A: I'm positive.**
**Q: Do you remember talking to federal agents in May 2010 down in Florida?**
**A: Yes.**
**Q: You talked to them about Sabrina Lightfoot, right?**
**A: Yes. . . .**
**Q: Did you tell them that you learned this bank fraud scam from Sabrina Lightfoot?**
**A: Yes.**
**Q: And was that the truth?**
**A: No.**
**[Dkt. 267 at 23-24.]**

Attorney Dolan strategically impeached witnesses through prior inconsistent statements at points he deemed appropriate, and he reasonably and effectively used grand jury testimony to discredit trial testimony. Mr. Johnson has not demonstrated how Attorney Dolan's cross-examinations of the aforementioned witnesses were unreasonable. The Court has reviewed the trial transcripts and finds that Attorney Dolan acted reasonably throughout each cross-examination. He strategically and systematically attacked the credibility of each witness using various cross-examination techniques. In addition to highlighting witnesses' inconsistent statements, Attorney Dolan questioned witnesses as to their cooperation with the Government and criminal history to call into question their credibility. [*See, e.g.*, Dkt. 267 at 26-29.]

Without Mr. Johnson presenting affirmative evidence of unreasonable conduct, the Court cannot conclude that Attorney Dolan's impeachment strategy at trial was unreasonable, deficient, or prejudicial.

**XII.**   **Failure to Advise of Right to Plead Guilty**

Mr. Johnson claims that defense counsel improperly advised him with respect to his plea offer, because Attorney Dolan "told Johnson that, because the discovery materials established a loss of well less than $1M, that he, Johnson, could go to trial, and loose [sic], and still come out on top because the loss amount would be established in the record. Counsel further told Johnson that, he, Johnson, could actually go to trial, loose [sic] and get less time than what the plea agreement provided for." Motion at 35. The Government raises the fact that Attorney Dolan provided Mr. Johnson with the Government's plea offer, a detailed explanation of the Guidelines as applied to the offer, and the scope of evidence and discovery. Opposition at 34; Dolan Affidavit at ¶¶ 4-7, 10. Attorney Dolan also attempted to negotiate with the Government for a plea agreement with a lower loss amount. Dolan Affidavit at ¶ 4.

When a defendant is deciding whether to accept a plea offer, defense counsel must balance two key principles regarding client representation. *See Purdy v. United States*, 208 F.3d 41, 44 (2d Cir. 2000). "On the one hand, defense counsel must give the client the benefit of counsel's professional advice on this crucial decision of whether to plead guilty." *Id.* (internal quotation marks omitted). This advice must include communicating the terms of the plea offer, and it may include informing defendant "of the strengths and weaknesses of the case against him" and alternative sentences absent acceptance of the plea offer. *Id.* at 45. "On the other hand, the ultimate decision whether to plead guilty must be made by the defendant." *Id.* A lawyer cannot "coerce a client into either accepting or rejecting a plea offer." *Id.*

The manner in which counsel advises the client "enjoys a wide range of reasonableness because '[r]epresentation is an art'" and counsel can effectively assist a client in countless ways. *Id.* (quoting *Strickland*, 466 U.S. at 689, 693). Relevant information for counsel to consider in advising client are: "the defendant's chances of prevailing at trial, the likely disparity in sentencing after a full trial as compared to a guilty plea (whether or not accompanied by an agreement with the government), the defendant's comprehension of the various factors that will inform his plea decision." *Purdy*, 208 F.3d at 45.

Attorney Dolan explained his discussions with Mr. Johnson regarding the evidence against him and the advisability of a plea:

> One of the issues I often discussed with Mr. Johnson was the amount of loss attributable to him. Conspiracy law was discussed in this area I explained to him how he could be held responsible for loss amounts that occurred during conspiracy. I attempted to negotiate the loss amount with the Government. The loss amounts and how the loss amounts related to Guidelines were explained to him repeatedly. . . . I thoroughly explained the Government's evidence against him and the strength of the Government's case. Prior to and during trail, I urged him to accept the Government's offer.

Dolan Affidavit at ¶¶ 4-5, 7.

Court concludes Attorney Dolan reasonably balanced his duties (1) to give his professional advice about whether to accept the plea offer and (2) to afford Mr. Johnson the ultimate decision of whether to plead guilty. *See Purdy*, 208 F.3d at 44. Attorney Dolan reviewed the Government's evidence with Mr. Johnson, analyzed the strength of the Government's case, and made clear that he did not think trial was a good idea. Dolan Affidavit at ¶¶4-5. 7.

Mr. Johnson cites *Raysor v. United States*, 647 F.3d 491 (2d Cir. 2011) for the proposition that the Court must conduct a hearing to gather evidence about off-the-record conversations. In *Raysor*, the Second Circuit clarified that the standard to determine the necessity of a hearing is akin to the summary judgment proceeding: "If material facts are in dispute, a hearing should usually be held, and relevant findings of fact made." *Id.* (quoting *Puglisi v. United States*, 586 F.3d 209, 213 (2d Cir. 2009)). The Second Circuit stated that where an ineffective assistance of counsel claim is based on improper advice leading to a plea offer rejection, the petitioner "must demonstrate a reasonable probability that but for the counsel's deficient performance, he would have pled guilty instead of going to trial." *Id.* at 495. Specifically, the petitioner was required to establish a *prima facie* case that he would have accepted a plea offer absent counsel's improper advice. "*Prima facie* evidence may include a petitioner's own statement, as was offered here; however, in order for the statement to be sufficiently credible to justify a full hearing, it must be accompanied by some 'objective evidence,' such as a significant sentencing disparity, that supports an inference that the petitioner would have accepted the proposed plea offer if properly advised. *Id.*; *see also Puglisi*, 586 F.3d at 216.

Where a petitioner has made a "self-serving" statement[2] that he was improperly advised regarding his plea agreement, that statement may be belied

---

[2] In *Puglisi*, the appellant failed to explicitly state in his affidavit that he would have pled guilty upon sufficient advice of counsel. Rather, that statement only appeared in the appellant's memorandum of law in support of his habeas petition. However, the *Puglisi* court evaluated appellant's claim even assuming "arguendo" that the statement in the memorandum of law had appeared in the

by other evidence.  *Puglisi*, 586 F.3d at 215.  For example, in *Puglisi*, it became clear at sentencing that Mr. Puglisi still had not accepted responsibility for his criminal conduct.  *Id*. at 218.  The sentencing court noted: "Mr. Puglisi wanted to plead guilty on his terms.  He wanted a guarantee that he would get no more than X amount of years.  He chose to go to trial.  He didn't accept responsibility."  *Id*.  In addition, the Second Circuit found no inference that Puglisi would have accepted a plea agreement if properly advised, because the appellant failed to provide the Court with the terms of any "purported plea agreement" including whether it required cooperation or the appellant's understanding of its terms, or any other "evidence sufficient to show, or permit an inference of, a significant disparity between the terms of a plea offer and his ultimate sentence exposure after a trial conviction."  *Id*. at 217.  Finally, the Second Circuit noted that the sentencing court made "numerous statements concerning the severity of the conduct at issue" which "undermine[d] any assertion by the appellant that he would have received the benefit of a lenient plea agreement."  586 F.3d at 218.  In light of all of the relevant circumstances, the Second Circuit found Mr. Puglisi's statement incredible and upheld the district court's decision not to hold a hearing on the matter.  *Id*.

Here, the evidence before the Court includes Johnson's statement that "had Johnson been made aware [of] the law regarding sentencing enhancements, based on 'intended loss' and 'actual loss' he would not have proceeded to a jury

---

sworn affidavit.  The Court finds that analysis instructive here, where Mr. Johnson made such a statement in his affidavit, and the facts undermining the credibility of that statement are otherwise analogous.

trial, but accepted the plea offer of the government."  Johnson Affidavit at ¶ 31.

Contradicting that statement, Attorney Dolan's affidavit states he "often

discussed with Mr. Johnson . . . the amount of loss attributable to him" as well as

"[c]onspiracy law" and "he could be held responsible for loss amounts that

occurred during conspiracy."  Dolan Affidavit at ¶ 4.  In addition, the Court

considers Johnson's statements during sentencing indicating that, even post-

trial, he denied guilt and refused to accept responsibility for the loss amount.

*Williams* [Dkt. 280 at 36-41.]  This statement must also be considered in light of

Johnson's affidavit, which states the "prosecutor was adamant about stipulating

to a loss of $1 Million" in any plea agreement.  Johnson Affidavit at ¶ 13.  Neither

party has provided the Court with the details of any proposed plea agreement, so

the Court cannot draw any inferences based on any disparity between the

sentence Johnson would have faced had he pled guilty and that which he

ultimately faced.  Finally, at sentencing, this Court made "numerous statements

concerning the severity of the conduct at issue" which "undermine[d] any

assertion by the appellant that he would have received the benefit of a lenient

plea agreement."  586 F.3d at 218.  Accordingly, as in *Puglisi*, the Court finds Mr.

Johnson has not adequately shown that he suffered prejudice due to any

inadequate advice of counsel regarding a plea agreement, and he is not entitled

to a hearing on this claim.  *Id.*

XIII.    <u>Failure to Investigate and Present Defense</u>

Lastly, Mr. Johnson contends defense counsel failed to investigate and

conduct a reasonable defense.  In particular, Mr. Johnson argues, "Of the some

68 witnesses who testified, both counsels, collectively, only cross-examined approximately 18, and briefly." Motion at 40. Mr. Johnson then lists 11 different instances[3] where defense counsel purportedly assisted the Government. *Id.* at 40-41. He has not, however, provided any factual or legal basis for the Court to conclude counsel's representation fell below an "objective standard of reasonableness" for allowing the 11 instances to occur or that there was a "reasonable probability" that the results would be different absent counsel's errors. *See Strickland*, 466 U.S. at 687-88, 694.

Courts routinely hold that where "allegations with regard to alleged counsel's errors in pre-trial preparation and investigation and trial advocacy are 'vague, conclusory, and unsupported by citation to the record, any affidavit, or any other source,'" ineffective assistance of counsel claims cannot be established. *Vasquez v. United States,* Nos. 96 CIV. 2104 (PKL), 91 CR. 153(PKL), 1997 WL 148812, at *12 (S.D.N.Y. Mar.28, 1997); *see also Davison v. United*

---

[3] These 11 examples include: "(a) permitting the Jury's copy of Government's Exhibit 301 to be "fixed" [see Day 2, November 3, 2011 @ TR. 30]; (b) permitting government witnesses to testify from notes, without objections, and more aggravatingly, permitting 8 additional exhibits to be entered, which were notes from the witnesses, without objections. [Id. @ TR 45-46]; (c) withdrawing claim that jury saw defendants in handcuffs[ ] [see Day 3, November 4, 2011 @ TR. 91]; (d) stipulating to damaging evidence[ ] [Id. @ TR. 89-91]; (e) permitting the special agent, who[ ] investigated the case and who[ ] would testify as expert witness, to remain in courtroom throughout entire trial, without sequester[;] (f) stipulating to what a government witness [Dianne Larson Lippard] a victim, would testify to [Day 5, November 8, 2011 @ TR. 11-13]; (g) stipulating to government's exhibits 154A-C and 140A-C[,] the Willingham and McGregor exhibits[ ] [Id. @ TR. 56]; (h) permitting the government to call witnesses out-of-turn[ ] [Day 7, November 10, 2011, @ TR. 243]; )i) permitting correction of error in Avid/Budget spread sheet, and its substitution[ ] [Day 9, November 15, 2011]; (j) permitting [i]nattentive jury (juror(s)) to deliberate on the case when the court specifically inquired as to this issue; and (k) permitting the government to lead its witnesses in literally hundreds of instances." *Id.* at 41.

*States,* No. 97 CR. 490 (LAP), 00 CIV. 3064 (LAP), 2001 WL 883122, at *8 (S.D.N.Y. Aug. 3, 2001) ("[B]lanket assertions against his trial counsel's performance in a self-serving affidavit," in the absence of objective evidence to support petitioner's claim, were insufficient).  The Court has previously addressed several instances listed by Mr. Johnson, but to the extent he raises new examples and cites to the record, the Court has evaluated these examples for deficient and prejudicial performance.  The Court finds that Mr. Johnson's complaints are fundamental examples of defense counsel's trial strategy.  As aforementioned, a "[d]ecisions whether to engage in cross-examination, and if so to what extent and in what manner, are . . . strategic in nature" and will not constitute ineffective assistance so long as they are reasonable.  *Nersesian*, 824 F.2d at 1321.  There is no evidence in the record that demonstrates any of counsel's trial strategies were unreasonable.  Furthermore, in light of the large number of witnesses and the ample evidence presented at trial, even if counsel were to have acted deficiently as to the issues raise in this claim, the Court finds Mr. Johnson has not established a reasonable likelihood that but for these claimed deficiencies there would likely have been a different outcome in light of the court's questions, admonitions and instructions to the jury both as jury selection and during the trial and the copious amount of highly credible and corroborative evidence against him.

<u>Conclusion</u>

There is no need for this Court to conduct a hearing on this habeas petition. Although courts generally "look with disfavor on summary rejection of a

habeas petition," *United States v. Aiello*, 900 F.2d 528, 534 (2d Cir.1990) (quotation omitted), the text of § 2255 provides that the court need not conduct a hearing where "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief," 28 U.S.C. § 2255(b) (2014); *see also Aiello*, 900 F.2d at 534 (finding no reversible error in the failure to conduct a hearing where the petition omitted "meritorious allegations that can be established by competent evidence" and the district court judge that ruled on the petition also presided over petitioner's trial) (citation and internal quotations omitted).  Mr. Johnson is not entitled to relief on any of his claims.  Therefore, this Motion to Vacate, Set Aside, or Correct Sentence pursuant to 28 U.S.C. § 2255 is DENIED.

The Court denies a certificate of appealability because jurists of reason would not find this procedural ruling debatable. *See Slack v. McDaniel*, 529 U.S. 473, 478 (2000). The Court CERTIFIES under 28 U.S.C. § 1915(a)(3) that any appeal would not be taken in good faith.

IT IS SO ORDERED.

_____
Hon. Vanessa L. Bryant
United States District Judge

Dated at Hartford, Connecticut: February 23,, 2018